# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **TINA LOUISE KEITH,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:15cv00042 |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

## I. Background and Standard of Review

Plaintiff, Tina Louise Keith, ("Keith"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument in this matter.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may

-1-

be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Keith filed an application for DIB on December 21, 2012, alleging disability as of March 15, 2009, due to neck injury, back problems and fibromyalgia. (Record, ("R."), at 183-84, 201.) The claim was denied initially and on reconsideration. (R. at 102-04, 107-10, 112-14.) Keith then requested a hearing before an administrative law judge, ("ALJ"). (R. at 115-16.) A video hearing was held on November 6, 2014, at which Keith was represented by counsel. (R. at 51-73.)

By decision dated January 30, 2015, the ALJ denied Keith's claim. (R. at 32-45.) The ALJ found that Keith met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2014. (R. at 34.) The ALJ also found that Keith had not engaged in substantial gainful activity since March 15, 2009, her alleged onset date.[1] (R. at 34.) The ALJ found that, through the date last insured, the medical evidence established that Keith suffered from severe impairments, namely degenerative disc disease of the lumbar spine; status-post cervical spine fusion in 2009; anxiety disorder; and disorders of fibromyalgia, but he found that Keith did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at

---

[1] Therefore, Keith must show that she became disabled between March 15, 2009, the alleged onset date, and March 31, 2014, the date last insured, in order to be entitled to DIB benefits.

34-37.) The ALJ found that, through the date last insured, Keith had the residual functional capacity to perform a range of sedentary work[2] with the capacity to fulfill work with short and simple, but not detailed, work instructions, that did not require more than occasional interpersonal interaction, overhead reaching, climbing of ramps and stairs, balancing, kneeling, crawling, crouching and stooping and that did not require climbing of ladders, ropes or scaffolds or exposure to hazards and heights. (R. at 37-43.) The ALJ found that Keith was unable to perform any of her past relevant work. (R. at 43.) Based on Keith's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Keith could perform, including jobs as a cleaner, a packer, an inspector/grader and a small parts assembler. (R. at 43-45.) Thus, the ALJ found that Keith was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 45.) *See* 20 C.F.R. § 404.1520(g) (2015).

After the ALJ issued his decision, Keith pursued her administrative appeals, (R. at 20), but the Appeals Council denied her request for review. (R. at 8-10.) Keith then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2015). The case is before this court on Keith's motion for summary judgment filed on January 5, 2016, and the Commissioner's motion for summary judgment filed January 20, 2016.

---

[2] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2015).

## II. Facts

Keith was born in 1966, (R. at 59), which, at the time of the ALJ's decision, classified her as a "younger person" under 20 C.F.R. § 404.1563(c). Keith completed the ninth grade in school and has past work experience as a sewing machine operator, a housekeeper, a nurse's aide, a floor cleaner and a caregiver. (R. at 57, 69.)

Vocational expert, Robert Jackson, also testified at Keith's hearing. (R. at 68-73.) Jackson classified Keith's prior work as a sewing machine operator as light[3] semi-skilled work. (R. at 69.) He also classified her prior work as a caregiver and a nurse's aide as medium,[4] semi-skilled work and her work as a housekeeper and a floor cleaner as medium, unskilled work. (R. at 69.) Jackson was asked to consider a hypothetical individual of Keith's age, education and work experience, who would be limited to light or sedentary work that did not require more than occasional bending, crouching, stooping, balancing, climbing of steps and stairs and interaction with supervisors and co-workers and that did not require working around heights or hazards, such as dangerous machinery, climbing ladders or scaffolds or public interactions. (R. at 69-70.) Jackson stated that such an individual could not perform Keith's past work. (R. at 70.) Jackson stated that the individual who was capable of sedentary work could perform other jobs existing in

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2015).

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2015).

-4-

significant numbers in the national economy, including those of an inspector/grader and a small parts assembler. (R. at 71.) He stated that the individual capable of light work could perform other jobs existing in significant numbers in the national economy, as well, including those of a cleaner and a packer. (R. at 71.) Jackson stated that no jobs would be available for a person who would be off-task 25 percent of the time due to medication side effects or who missed two days a month due to pain and symptoms. (R. at 72.)

In rendering his decision, the ALJ reviewed medical records from Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Bert Spetzler, M.D., a state agency physician; David L. Niemeier, Ph.D., a state agency psychologist; Dr. Robert Keeley, M.D., a state agency physician; Virginia Commonwealth University, ("VCU"), Health Systems; Family Physicians of Marion; Johnston Memorial Hospital; Wytheville Family Medicine; Carilion Spine Clinic; New River Valley Medical Center; and Dr. Kari Lucas, M.D.

Keith treated with Family Physicians of Marion from 2008 to 2011. (R. at 305-79.) During this time, it appears that Keith was seen monthly for medication refills, including narcotic pain medication. (R. at 367-79.) Many of these treatment notes, however, do not contain the date of treatment. (R. 305, 307-14, 321-23, 325, 327.)

On August 29, 2008, Keith complained of left shoulder pain, which she rated an 8 on a 10-point scale, and which she said worsened when she sat in the same position at work. (R. at 365.) Her physical examination revealed that she was tender in the C5-6 area of her cervical spine. (R. at 365.) She was diagnosed with

cervical degeneration and given a prescription for Vicodin ES, and an MRI was scheduled for September 10, 2008, at Johnston Memorial Hospital, ("JMH"). (R. at 365.)

A September 10, 2008, report from Dr. Matthew Cobb noted that the MRI of Keith's cervical spine showed degenerative end plate changes with disc space narrowing at the C5-6 and C6-7 levels with anterior thecal sac effacement at both of these levels. (R. at 362-63.) At the C5-6 level, Dr. Cobb noted a broad-based disc osteophyte complex with mild central canal stenosis, more prominent on the left, mild right neuroforaminal stenosis and moderate left neuroforaminal stenosis. (R. at 362.) At the C6-7 level, Dr. Cobb noted a broad-based disc osteophyte complex eccentric to the left with mild central canal stenosis and no significant neuroforaminal stenosis. (R. at 362.) Dr. Cobb's impression was degenerative disc changes at the C5-6 and C6-7 levels with central canal and neuroforaminal stenosis. (R. at 363.)

Keith returned to see Dayle Zanzinger, F.N.P., at Family Physicians of Marion on September 30, 2008, for complaints of sinus congestion and ear pain and for the results of her recent MRI. (R. at 364.) Keith complained of headache, shoulder pain and neck pain and was prescribed Vicodin. (R. at 364.) On October 6, 2008, Keith returned and saw Dr. David G. Parker, D.O., complaining that Vicodin did not help her pain and caused nausea. (R. at 361.) Keith complained of neck and back pain, and she rated her back pain as a 6 on a 10-point scale. (R. at 361.) Dr. Parker diagnosed spinal stenosis and prescribed Percocet. (R. at 361.) Keith returned to see Dr. Parker on October 20, 2008, and reported that Percocet seemed to help, but she was still sore. (R. at 358.) Dr. Parker diagnosed spinal

-6-

canal stenosis and neuroforaminal stenosis, prescribed Percocet and recommended a neurosurgical evaluation at the University of Virginia, ("UVA"). (R. at 358.) Keith saw Dr. Parker again on October 31, 2008, and complained that Percocet did not relieve her neck and shoulder pain. (R. at 357.) Dr. Parker diagnosed cervical spinal stenosis and gave her another prescription for Percocet. (R. at 357.) Dr. Parker noted that Keith had an appointment at UVA on February 5, 2009. (R. at 357.)

Keith saw Zanzinger again on November 19, 2008, for sinusitis. (R. at 360.) She also complained of left shoulder pain. (R. at 360.) Zanzinger diagnosed chronic pain and refilled Keith's Percocet prescription. (R. at 360.) On December 18, 2008, Dr. Parker saw Keith for complaints of worsening pain with cold. (R. at 359.) Dr. Parker diagnosed degenerative disc disease, cervical stenosis and chronic intractable pain; he gave Keith another Percocet prescription. (R. at 359.) Dr. Parker saw Keith again on January 16, 2009, and gave her another Percocet prescription. (R. at 356.)

Keith returned to Dr. Parker on February 13, 2009, complaining that she had been seen at UVA, and the doctor there "didn't help at all." (R. at 355.) Keith complained of back pain, which she rated an 8 on a 10-point scale, and she said that her Percocet prescription did not help "much at all any more." (R. at 355.) Dr. Parker referred Keith to Dr. Graham at the Medical College of Virginia. (R. at 355.) Keith returned for a medication refill on March 12, 2009, and reported that she had an appointment with Dr. Graham on March 17, 2009. (R. at 354.) Dr. Parker noted that Keith was then laid off from work. (R. at 354.)

Keith saw Dr. R. Scott Graham, M.D., at VCU Health Services/Medical College of Virginia, for a neurosurgical initial visit on March 17, 2009, for complaints of neck and shoulder pain. (R. at 301-02.) Keith reported many years of pain, which radiated into her shoulders on occasion. (R. at 301.) Nonetheless, Dr. Graham noted no radicular symptoms. (R. at 301.) Keith rated her pain at an 8 on a 10-point scale, and she reported that she had been unable to work since July due to pain; she stated that she took Percocet and ibuprofen for pain relief. (R. at 301.)

Keith stated that she suffered from a history of chronic bronchitis, arthritis and depression. (R. at 301.) She also complained of loss of appetite, weakness, ringing in her ears, occasional headaches, sinusitis, acid reflux, arthritis, depression and anxiety. (R. at 301.) Dr. Graham noted that Keith walked with a normal gait and exhibited normal strength throughout her upper extremities with no sensory abnormalities. (R. at 301.) He also noted that Keith's reflexes were 2+. (R. at 301.) Dr. Graham noted that an MRI of Keith's cervical spine from September 2008 showed a focal area of spondylosis at C5-6 with a bone spur that narrowed to the left foramen. (R. at 301.) Dr. Graham told Keith that, if her pain was not responding to other treatments, she should consider a one-level anterior cervical fusion at the C5-6 level. (R. at 301-02.)

Keith saw Dr. Parker again on April 9, 2009, seeking a refill of her pain medication and an inhaler for her bronchitis. (R. at 353.) Dr. Parker diagnosed Keith with chronic obstructive pulmonary disease, ("COPD"), in addition to chronic intractable pain and foraminal stenosis. (R. at 353.) Dr. Parker noted that Keith continued to smoke a pack of cigarettes a day. (R. at 353.) He also noted that

she was scheduled to have neck surgery on April 15, 2009. (R. at 353.)

Keith was seen again by Dr. Graham on April 14, 2009, for a preoperative examination before a anterior cervical fusion procedure scheduled for the next day. (R. at 299-300.) Keith reported a long history of neck pain, which started with a car accident about five years earlier. (R. at 299.) She complained of pain that radiated into both shoulders and up into her head. (R at 299.) She reported that she took Percocet for pain, but had refused physical therapy. (R. at 299.) She, again, reported chronic bronchitis, arthritis and depression. (R. at 299.) A preoperative chest x-ray showed no acute cardiopulmonary abnormality. (R. at 298.)

Dr. Graham's operative note of April 15, 2009, stated that Keith's preoperative and postoperative diagnosis was cervical spondylosis with herniated disk and left-sided foraminal narrowing at the C5-6 level. (R. at 287.) He performed an anterior cervical diskectomy, bilateral foraminotomy, allograft and instrumented fusion at the C5-6 level with no complications. (R. at 288.) A postoperative x-ray of Keith's cervical spine showed her status-post anterior fusion of the C5-6 vertebrae with no evidence of fracture or hardware failure. (R. at 291-92.) Keith was discharged the next day with instructions for no strenuous exercise for one month, no heavy lifting and no heavy housework for one month. (R. at 282, 285-86.)

Zanzinger saw Keith again on May 5, 2009, for refills on her medications, and Zanzinger diagnosed chronic pain and tobacco abuse. (R. at 352.) She wrote Keith a refill of her Percocet prescription. (R. at 352.) Keith returned to see Dr. Graham on May 26, 2009. (R. at 270.) Dr. Graham noted that Keith seemed to be

-9-

doing okay, though she continued to complain of posterior neck pain that radiated into the back of her head with some numbness and pain that radiated down between her shoulder blades. (R. at 270.) Keith reported wearing the cervical collar as instructed. (R. at 270.) Her incision was well-healed; her strength in her upper extremities was normal; and she did not seem to have any sensory defects in her upper extremities. (R. at 270.) She denied any problem swallowing. (R. at 270.) Dr. Graham noted that cervical x-rays taken that day showed that the fusion looked solid. (R. at 269-70.) He stated that he thought that Keith's remaining symptoms of posterior neck pain and numbness in the occipital nerve distribution might be related to wearing the cervical collar. (R. at 270.) Dr. Graham recommended that Keith use heat massage and light exercise to help with the pain. (R. at 270.) He noted that she could slowly progress to her normal activity level. (R at 270.) Antero-posterior and lateral cervical spine x-rays performed on May 26, 2009, showed that Keith had undergone a previous cervical anterior fusion at the C5-6 level with unchanged position since postoperative studies, intact alignment and no prevertebral soft tissue swelling. (R. at 269.)

On June 3, 2009, Keith was seen by Dr. Brian Stiefel, M.D., at Family Physicians of Marion. (R. at 351.) Dr. Stiefel noted that Keith was seeking a refill of her pain medication. (R. at 351.) Keith complained of an increased stress level and sought a prescription for either Xanax or Valium, stating that she had taken those medications before. (R. at 351.) Dr. Stiefel diagnosed neck pain with cervical stenosis, refilled her Percocet prescription for only one month and stated that he would not provide her with a prescription for an addictive benzodiazepine medication. (R. at 351.)

-10-

On July 1, 2009, Keith saw Dr. Parker for refills on her medications and complaints of increased anxiety. (R. at 350.) Dr. Parker wrote her prescriptions for Percocet and propranolol and recommended increased exercise. (R. at 350.) Keith returned to see Zanzinger on July 22, 2009, complaining of a lot of stress since her husband had his fourth back surgery. (R. at 349.) Zanzinger noted that Keith seemed quite agitated, and Keith stated that she thought she suffered from attention deficient disorder. (R. at 349.) Zanzinger prescribed trazadone to help Keith sleep better. (R. at 349.) On August 26, 2009, Keith returned to Dr. Parker, requesting another MRI because she was experiencing a lot of neck pain. (R. at 348.) Keith said that the propranolol made her "hyper" with a fast heart beat. (R. at 348.) Dr. Parker wrote a prescription for Percocet. (R. at 348.) Starting on this date, Keith's medical reports from Family Physicians noted "narcotic slip on back." (R. at 348.) A September 2, 2009, cervical x-ray showed bilateral uncinate spurs with her prior anterior cervical fusion at the C5-6 level. (R. at 347.)

Keith returned to Family Physicians for narcotic pain medication and routine ailments on a monthly basis from September 23, 2009, to December 13, 2010. (R. at 307-16, 319-23, 328-46.) On June 11, 2010, Dr. Parker wrote Keith prescriptions for an increased dosage of Paxil and Xanax in addition to Percocet. (R. at 335.) On October 13, 2010, Keith complained of sharp pain without radiation over her sacroiliac joint. (R. at 331.) On November 11, 2010, Keith complained of "Charlie horses" and nerve/muscle spasms all over her body for the past two weeks. (R. at 330.) On December 13, 2010, Keith said that the muscle spasms had decreased, but she complained of increased myalgia and lumpiness in her legs. (R. at 328.) Dr. Parker noted no lesions. (R. at 328.)

-11-

Keith was seen at the emergency department at JMH on April 26, 2011, for complaints of "pain all over." (R. at 390-96.) Keith complained of worse pain than usual and said that she did not have a primary care physician. (R. at 391.) Keith reported that she fell down stairs the previous Saturday. (R. at 391.) She said that she was treated at another emergency room and given a prescription for Ultram, but she said it caused diarrhea. (R. at 391.) It was noted that Keith appeared comfortable and in no acute distress. (R. at 391.) It also was noted that Keith was not forthcoming with her previous treatment and prescriptions for Percocet and Xanax until she was told by the physician that her prescription history would be checked. (R. at 392.) She said that she had flushed these medications down the toilet because they were making her sick. (R. at 392.) A record check revealed she had recently received prescriptions for Percocet and Xanax. (R. at 392.) Contact with Dr. Parker revealed that he had a pain contract with Keith and that she was not supposed to seek pain medication from any other providers. (R. at 393.) Keith was given a prescription for Toradol and discharged. (R. at 393.)

X-rays of Keith's lumbar spine taken on September 27, 2011, were unremarkable. (R. at 398.)

On March 15, 2012, Keith was seen at the emergency department at JMH for an injury to her right knee. (R. at 399-405.) Keith said that she tripped on steps and landed on her right knee. (R. at 401.) Keith had pain with range of motion and on palpation of her anterior right knee, but there was no swelling or effusion observed. (R. at 402.) X-rays taken of Keith's right knee were normal. (R. at 407.) Her knee was placed in an immobilizer. (R. at 399.) She was discharged with a prescription for Percocet and instructed for follow up with an orthopedic physician. (R. at 399.)

-12-

On April 19, 2012, Dr. Kari Lucas, D.O., with Wytheville Family Medicine, examined Keith. (R. at 410-14.) Keith presented as a new patient with complaints of problems with her legs and wrists and neck pain. (R. at 410.) Keith also complained of numbness in her hands at times. (R. at 410.) She denied any low back pain. (R. at 410.) She also complained of problems with anxiety and depression, but she stated that she was not then taking any medication for these problems. (R at 410.) The ranges of motion in Keith's neck and elsewhere were normal. (R. at 412.) She displayed normal reflexes, and there was no tenderness or edema noted. (R. at 412.) Dr. Lucas prescribed Ultram, Baclofen, Neurontin and Mobic. (R. at 412.)

Keith returned to see Dr. Lucas for her leg pain on May 18, 2012. (R. at 415.) She complained of pain from her hips down, but denied any back pain; she also complained of some numbness and tingling in her legs. (R. at 415.) Keith stated that her medications were not helping her pain at all. (R. at 415.) She also complained of being anxious with panic attacks a few times a day, being moody and irritable with problems focusing and no energy or motivation. (R. at 415.) Dr. Lucas renewed Keith's prescriptions for Ultram and Neurontin and started her on Effexor. (R. at 417-18.)

On June 18, 2012, Keith returned, complaining that the Ultram and Neurontin were not helping with her pain, and she did not get the Effexor prescription filled. (R. at 419.) She complained of leg and hip pain, but not back pain. (R. at 419.) She also complained of problems falling and staying asleep. (R. at 419.) Dr. Lucas changed Keith to Ultracet, increased her dosage of Neurontin and started her on Ambien. (R. at 419-20.) On July 19, 2012, Keith said her pain

was about the same, and she requested to change back to Ultram, which she said worked better. (R. at 424.) In addition to leg pain, she complained of pain in her right shoulder of a month's duration. (R. at 424.) Dr. Lucas noted decreased range of motion and tenderness in Keith's right shoulder. (R. at 426.) Dr. Lucas switched Keith back to Ultram and added Flexeril. (R. at 424-25.)

An August 28, 2012, MRI of Keith's lumbar spine showed small posterior disc bulges at the T-12-L1, L1-2 and L2-3 levels causing minimal compression on the ventral sac surface. (R. at 497.) At the L3-4 level, there was a small posterior disc bulge with developmental short pedicles, facet hypertrophy and ligamentum flavum hypertrophy, causing mild spinal stenosis. (R. at 497.) At the L4-5 level, there was a posterior disc bulge with developmental short pedicles, facet hypertrophy, and ligamentum flavum hypertrophy causing moderate spinal canal stenosis and mild compression of the lateral recess bilaterally. (R. at 497.) At the L5-S1 level, there was evidence of a small right posterior lateral annular disc tear with no significant spinal canal stenosis or neural foraminal narrowing. (R. at 497.) The overall impression of the radiologist was multilevel degenerative changes. (R. at 497.) Keith returned to Dr. Lucas on August 20, 2012, complaining of pain and muscle spasms randomly all over her body. (R. at 429.) She also complained of back pain. (R. at 430.)

On September 20, 2012, Dr. Lucas noted that Keith returned for recheck on her back after having an MRI that showed small disc herniations, spinal stenosis and degenerative changes in her entire lumbar spine. (R. at 434.) Dr. Lucas noted that she would refer Keith to a back surgeon to see if anything could be done for

-14-

her pain. (R. at 436.) She also changed Keith's pain medication to Tylenol #3 with codeine, but she noted that, if Keith needed any stronger medication, she would need to see a pain management specialist. (R. at 436.) Keith returned on October 19, 2012, requesting stronger pain medication, but, again, Dr. Lucas told her that she would have to see a pain management specialist for stronger medication. (R. at 440.) On December 10, 2012, Keith complained of worsening pain in her lower back down both legs to her ankles. (R. at 443.) Keith reported that she had been seen by a neurosurgeon who wanted to order a myelogram, but she said that she refused. (R. at 443.) Dr. Lucas noted decreased range of motion and spasm in Keith's cervical, thoracic and lumbar spine with pain in Keith's lumbar spine. (R. at 445.) Dr. Lucas changed Keith's medications to Ultracet and Robaxin. (R. at 446.) Dr. Lucas also offered to order physical therapy, but Keith declined. (R. at 446.)

On January 10, 2013, Keith returned, complaining of pain in her legs. (R. at 449.) She reported that her neurosurgeon wanted to perform an epidural injection for her pain, but she refused. (R. at 449.) Dr. Lucas discontinued Keith's prescription for Robaxin and, instead, prescribed Valium. (R. at 451.) On February 8, 2013, Keith returned, reporting that the Valium had helped with her nerves. (R. at 455.) On May 8, 2013, Keith returned, stating that her back pain was worse. (R. at 460.) She claimed that her pain medication was no longer working. (R. at 460.) Dr. Lucas prescribed Tylenol # 4 and referred Keith for a neurosurgical evaluation. (R. at 462.) On June 11, 2013, Keith reported that the medications helped "some," but her pain in her back and right leg was worse. (R. at 465.)

On April 24, 2013, Howard S. Leizer, Ph.D., a state agency psychologist,

completed a Psychiatric Review Technique form, ("PRTF"), finding that Keith suffered from an anxiety-related disorder. (R. at 78.) He opined that Keith was not restricted in her ability to perform her activities of daily living, in maintaining social functioning or in maintaining concentration, persistence or pace. (R. at 78.) Leizer also opined that Keith had not experienced repeated episodes of decompensation of extended duration. (R. at 78.) Leizer further opined that Keith's anxiety-related disorder was not severe because she was not then taking any medication or seeking any treatment. (R. at 78.)

On April 23, 2013, Dr. Bert Spetzler, M.D., a state agency physician, completed a physical residual functional capacity assessment of Keith in connection with her initial disability review. (R. at 79-81.) Dr. Spetzler opined that Keith could perform light work with limited right overhead reaching, occasional climbing of ladders/ropes/scaffolds, stooping, kneeling and crouching and no crawling or concentrated exposure to temperature extremes, wetness, humidity or hazards, such as machinery or heights. (R. at 79-81.)

On June 20, 2013, Dr. Nicholas Qandah, D.O., a neurosurgeon, examined Keith on referral from Dr. Lucas. (R. at 473-78.) Keith complained of back pain radiating down the front and back of her right leg with intermittent numbness and tingling in her feet. (R. at 473.) Dr. Qandah noted that Keith's gait was normal, and her lumbar region was nontender to palpation. (R. at 475.) Her straight leg raise testing was negative, and there was no muscle atrophy. (R. at 475.) Her reflexes were normal, and there were no sensory deficits appreciated in her lower extremities. (R. at 475.) Dr. Qandah noted that a review of Keith's lumbar MRI showed a small L4-5 disc bulge with annulus tear. (R. at 475.) Dr. Qandah

-16-

recommended that Keith undergo an epidural steroid injection. (R. at 473.) It appears that Keith received the epidural steroid injection on July 22, 2013. (R. at 520.)

Keith saw Dr. Qandah again on August 19, 2013. (R. at 502.) Keith complained that her radiating pain continued despite a recent epidural steroid injection. (R. at 502.) Dr. Qandah ordered another lumbar MRI. (R. at 502.) Another MRI of Keith's lumbar spine was performed on September 4, 2013. (R. at 498.) The report from this study noted mild facet joint degenerative changes at the L2-3, L3-4 and L4-5 levels. (R. at 498.) At the L3-4 level, there was a small posterior disc osteophyte complex with congenitally narrow pedicles. (R. at 498.) At the L4-5 level, there was a posterior annular tear and diffuse broad-based disc bulge, causing narrowing of the central canal. (R. at 498.) There was no evidence of neural foraminal narrowing, but the disc was in contact with the bilateral exiting nerve roots. (R. at 498.) There was a small right lateral annular tear at the L5-S1 level with a diffuse broad-based disc bulge with no evidence of central canal or neural foraminal narrowing. (R. at 498.) The radiologist noted no significant changes when compared to Keith's earlier MRI; the impression was mild degenerative changes in the lower lumbar spine. (R. at 498.)

Keith saw Dr. Lucas again on September 11, 2013. (R. at 509-12.) Keith said she was about the same, with the same amount of pain. (R. at 509.) She complained that her nerves were getting worse and that the Valium was not working as well as before. (R. at 509.) Dr. Lucas increased her dosage of Valium. (R. at 512.)

Keith was evaluated by Dr. Richard Weiss, M.D., a physical medicine and rehabilitation specialist, on referral from Dr. Qandah on September 17, 2013. (R. at 516-20.) Keith told Dr. Weiss that she had suffered from chronic low back pain for approximately one and one-half years. (R. at 516.) She complained that her symptoms were worsening despite epidural steroids injections and taking Tylenol #4, Valium and Neurontin. (R. at 516.) Keith did report some good short-term response to an epidural steroid injection earlier that year. (R. at 516.) She described her pain as sharp, dull, stabbing, throbbing, aching, burning with some numbness and tingling; she rated her pain at a 9 on a 10-point scale. (R. at 516.) Keith said that "everything" made her symptoms worse. (R. at 516.)

Dr. Weiss noted tenderness in Keith's lumbar spine with negative straight leg raise testing. (R. at 518-20.) Dr. Weiss recommended that Keith continue taking Neurontin and receive another epidural steroid injection, but he noted that she refused physical therapy. (R. at 520.)

On November 1, 2013, David L. Niemeier, Ph.D., a state agency psychologist, completed a PRTF, finding that Keith suffered from an anxiety-related disorder. (R. at 90-91.) He opined that Keith was not restricted in her ability to perform her activities of daily living, in maintaining social functioning or in maintaining concentration, persistence or pace. (R. at 90.) Niemeier also opined that Keith had not experienced repeated episodes of decompensation of extended duration. (R. at 90.) Niemeier also opined that Keith's anxiety-related disorder was not severe because she was not then taking any medication or seeking any treatment. (R. at 91.)

-18-

On November 1, 2013, Dr. Robert Keeley, M.D., a state agency physician, completed a physical residual functional capacity assessment of Keith in connection with her disability review upon reconsideration. (R. at 92-94.) Dr. Keeley opined that Keith could perform light work with limited right overhead reaching, occasional climbing of ladders/ropes/scaffolds, stooping, kneeling and crouching and no crawling or concentrated exposure to temperature extremes, wetness, humidity or hazards, such as machinery or heights. (R. at 92-94.)

Keith returned to see Dr. Lucas on December 11, 2013. (R. at 527-30.) Keith stated that she had stopped taking Ultram because, despite the fact it helped her pain, it was making her fall. (R. at 527.) Dr. Lucas prescribed Tylenol #4. (R. at 530.) On January 8, 2014, Keith told Dr. Lucas that her back pain was getting worse; she also complained of leg pain and insomnia. (R. at 533.) She said her Valium helped more with her muscle spasms than with her anxiety. (R. at 533.) She complained of a lot of muscle spasms in her feet and legs, saying that they jerked or tensed up on her frequently. (R. at 533.) Keith complained of being under a lot of stress, that she was moody and irritable and that she was sleeping only a few hours a night. (R. at 533.) She said that she had recently taken her husband's prescription for Halcion, and "it helped her a lot." (R. at 533.) Dr. Lucas prescribed Prozac and Halcion. (R. at 536.)

On March 7, 2014, Keith complained of worsening back pain. (R. at 539.) She said Tylenol #4 helped with her lower back pain, but did not help with her leg pain; she said Ultram helped with her leg pain but did not help with her back pain. (R. at 539.) Dr. Lucas prescribed both Tylenol #4 and Ultram at a lower dose. (R. at 542.) On April 7, 2014, Dr. Lucas noted that Keith felt much better and had seen

-19-

a significant improvement in her pain since restarting Ultram. (R. at 545.) Keith said that she was able to get up and do more. (R. at 545.) Dr. Lucas noted, "She is very happy with how she feels." (R. at 545.)

On June 5, 2014, Dr. Lucas said that Keith complained that her anxiety was a little bit worse, but she denied any kind of panic attacks. (R. at 551.) Keith said that she recently fell and injured her left knee. (R. at 551.) She said that she was treated at an emergency department, where she was told that she had torn some ligaments, but nothing was broken. (R. at 551.) She said she could not afford orthopedic care. (R. at 551.) Dr. Lucas prescribed BuSpar and referred her for an orthopedic appointment. (R. at 554.) Keith returned to Dr. Lucas on July 7, 2014, complaining that her anxiety was not well-controlled on Valium. (R. at 557.) She said that she was anxious all the time. (R. at 557.) Dr. Lucas prescribed Prozac. (R. at 560.) On August 4, 2014, Keith requested that Dr. Lucas place her on Tylenol #4 instead of Ultram because the Ultram were not helping her as well as they used to. (R. at 563.) She said that her Valium were helping her anxiety and that she was taking her Prozac only every once in a while. (R. at 563.) Dr. Lucas prescribed Tylenol #4 and offered to send Keith to a pain management doctor, but Keith declined the offer. (R. at 566.) On November 4, 2014, Keith reported that her pain was doing well, and she was comfortable and able to function on Tylenol #4. (R. at 572.) She complained of not sleeping very well. (R. at 572.)

## III.  Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2015); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62

(1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2015).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Keith argues that substantial evidence does not support the ALJ's finding that she was not disabled. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-7.) In particular, Keith argues that substantial evidence does not support the ALJ's finding that there were other jobs existing in significant numbers that she could perform. (Plaintiff's Brief at 8-11.) Keith argues that the ALJ found that Keith could perform a range of only sedentary work, but, nonetheless, found that both light and sedentary jobs existed in the economy that Keith could perform. (Plaintiff's Brief at 8-12.) Keith further argues that the ALJ

-21-

failed to properly consider her allegations of disabling pain. (Plaintiff's Brief at 12-15.)

The ALJ found that Keith had the residual functional capacity to perform a range of sedentary work with the capacity to fulfill work with short and simple, but not detailed, work instructions, that did not require more than occasional interpersonal interaction, overhead reaching, climbing of ramps and stairs, balancing, kneeling, crawling, crouching and stooping and that did not require climbing of ladders, ropes or scaffolds or exposure to hazards and heights. (R. at 37-43.) The vocational expert identified four jobs that a hypothetical individual of Keith's age, education, work experience and residual functional capacity could perform. (R. at 71.) He identified two jobs at the light exertional level, as a cleaner and as a packer, and two jobs at the sedentary exertional level – as an inspector/grader and as a small parts assembler. (R. at 71.) As the Commissioner concedes in her brief, the ALJ should not have found that Keith could perform the two light jobs.

With regard to the two sedentary jobs, Keith argues that the ALJ also erred in relying on the existence of inspector/grader jobs because he cited to a nonexistent Dictionary of Occupational Titles, ("DOT"), number. Even if this job is discarded, however, the ALJ's finding that other jobs were available in significant numbers in the regional and national economies is supported by his finding that Keith could perform the job of a small parts assembler. This job, as described in the DOT, does not require kneeling, climbing or crawling. *See* 2 DICTIONARY OF OCCUPATIONAL TITLES, final assembler, occupational code

713.687-018 (4th ed. rev. 1991). Furthermore, the vocational expert testified that 800 of these jobs were available regionally and 35,000 nationally. *See Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979) (stating 110 jobs is not an insignificant number). Therefore, I find that substantial evidence exists in the record to support the ALJ's finding that other jobs, which Keith could perform, were available in significant numbers in the economy.

Keith also argues that the ALJ failed to properly consider her allegations of disabling pain. (Plaintiff's Brief at 12-15.) The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain

-23-

the claimant alleges she suffers ....

76 F.3d at 595.

In Keith's case, the ALJ found that she suffered from a medically determinable impairment that reasonably could be expected to cause the symptoms she alleged. (R. at 38.) Nonetheless, the ALJ found that Keith's allegations "concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. at 38.) In particular, the ALJ found that the evidence of record regarding Keith's own description of her activities and lifestyle, the degree of medical treatment rendered, discrepancies between Keith's assertions and the information contained in the documentary reports, Keith's demeanor at the hearing, and her medical history, findings and the reports from the reviewing, treating and examining practitioners conflicted with her claim of disabling pain. (R. at 39.) Despite her complaints of disabling pain, Keith has refused offers for additional diagnostic testing, referrals to physical therapy, epidural steroid injections and referral to pain management. (R. at 443, 446, 449, 520, 566.) Also, objective tests have not revealed any findings to explain her ongoing complaints of debilitating pain. In fact, her most recent lumbar MRI revealed only mild degenerative changes. (R. at 498.) Although Keith claimed that she needed a cane, at times, to walk, the medical reports do not state that she exhibited any difficulty walking and, in fact, state that she exhibited a normal gait with no difficulty walking. (R. 301, 475.) Based on this, I find that the ALJ applied the proper analysis and that substantial evidence supports his decision discrediting Keith's complaints of disabling pain.

-24-

Based on the above reasoning, I find that substantial evidence exists in the record to support the ALJ's finding that Keith was not disabled. I will deny Keith's motion for summary judgment and grant the Commissioner's motion for summary judgment affirming her decision denying benefits. An appropriate Order and Judgment will be entered.

ENTERED: October 28, 2016.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE